[Cite as *Caron v. Caron*, 2017-Ohio-1070.]

**IN THE COURT OF APPEALS OF OHIO**
**SECOND APPELLATE DISTRICT**
**GREENE COUNTY**

| | |
|---|---|
| AMANDA L. CARON | : |
| | :     Appellate Case No. 2016-CA-37 |
| Plaintiff-Appellant | : |
| | :     Trial Court Case No. 2014-DR-61 |
| v. | : |
| | :     (Domestic Relations Appeal from |
| JOSHUA J. CARON | :     Common Pleas Court) |
| | : |
| Defendant-Appellee | : |
| | : |

. . . . . . . . . . .

O P I N I O N

Rendered on the 24th day of March, 2017.

. . . . . . . . . . .

CHERYL R. WASHINGTON, Atty. Reg. No. 0038012, 10 West Second Street, Suite 2225, Dayton, Ohio 45402
    Attorney for Plaintiff-Appellant

CRAIG M. SAMS, Atty. Reg. No. 0089716, Kirkland & Sommers Co., LPA, 130 West Second Street, Suite 840, Dayton, Ohio 45402
    Attorney for Defendant-Appellee

. . . . . . . . . . . . .

HALL, P.J.

{¶ 1} Amanda L. Caron appeals from the trial court's final judgment and divorce decree that, among other things, terminated the parties' marriage, divided their assets and liabilities, and designated appellee Joshua J. Caron as residential parent and legal custody of their minor child.

{¶ 2} Amanda advances five assignments of error. First, she contends the trial court's legal-custody decision is against the manifest weight of the evidence. Second, she challenges the trial court's findings regarding Joshua's alleged drug and alcohol abuse. Third, she claims the trial court abused its discretion in failing to find that she, rather than Joshua, could provide greater "stability" for their child. Fourth, she asserts that the trial court abused its discretion in finding her underemployed and in awarding only a 30 percent child-support deviation. Fifth, she maintains that the trial court abused its discretion in awarding Joshua one-half of the equity in certain Texas real estate.

{¶ 3} The record reflects that the parties married in July 2005 and had one child together in 2009. Amanda filed a divorce complaint in March 2014, and Joshua counterclaimed for divorce that same month. Based on the evidence presented at a two-day final hearing, a magistrate filed a lengthy December 2015 decision and order granting the parties a divorce on grounds of incompatibility. (Doc. #87). The magistrate also divided the parties' assets and liabilities, designated Joshua the residential parent and legal custodian of the parties' child, and ordered Amanda to pay child support. With regard to her child-support obligation, the magistrate found her voluntarily underemployed and imputed income. It also granted her a 30 percent downward deviation in her support obligation to account for the "significant" amount of parenting time she has with the child

and her payment of one-half of daycare costs. (*Id.*).

{¶ 4} Amanda filed objections and supplemental objections to the magistrate's decision. (Doc. #89, 107). The trial court addressed and overruled all of her objections in a July 2016 entry. (Doc. #124). The trial court subsequently filed the above-referenced final judgment and divorce decree. (Doc. #125). This appeal followed.

{¶ 5} As a means of analysis, we will address Amanda's first, second, and third assignments of error together as they all relate to the trial court's designation of Joshua as the residential parent and legal custodian of their child. As set forth above, the second assignment of error challenges the trial court's findings regarding Joshua's alleged drug and alcohol abuse, and the third assignment of error challenges the trial court's failure to find that Amanda offers the parties' child more "stability" than Joshua. The issues raised in both of these assignments of error are relevant, however, only insofar as they impact the trial court's designation of Joshua as the child's residential parent and legal custodian, which is the subject of the first assignment of error.

{¶ 6} Upon review, we see no abuse of discretion in the trial court's findings regarding Joshua's alleged drug and alcohol abuse. During the final hearing, Amanda presented witnesses who attempted to characterize him as a heavy drinker who became intoxicated on weekends and who abused drugs. These witnesses included Amanda, her mother, and her new boyfriend. The testimony included allegations of Joshua drinking excessively at home, smoking marijuana with his new girlfriend at a nightclub, and missing a scheduled hair follicle drug-screening test. For his part, Joshua denied the allegations of alcohol abuse and drug use and explained that he missed the scheduled test due to pre-scheduled surgery. In their respective rulings, the magistrate and the trial

court both addressed the issues of drinking and drug use.

{¶ 7} The magistrate made the following findings:

Mother spent a significant amount of time trying to convince the Court and the guardian that Father has a drug abuse problem. While it is puzzling that Father did not timely complete the hair follicle test when first ordered, the Magistrate is not convinced that Mother's allegations are true. Mother alleged Father has a drinking problem and her Mother testified that she observed it during the marriage. The Magistrate finds that the grandmother's testimony regarding Father's drinking to be exaggerated and were [sic] not credible. Father has never been found by his employer to have a positive drug screen despite random tests, and Father has not been charged with any drug or alcohol related crime. The Magistrate finds that Mother and her boyfriend's testimony about Father's trip to the nightclub in October of 2014 was a self-serving attempt to gain an advantage in the custody proceeding. The Magistrate simply does not believe Mother's testimony regarding that evening as there was indicia of dishonesty during parts of the testimony. Mother alleged at the June hearing that she was so concerned over Father's mental health that she contacted his commanding officer. The Magistrate believes that Mother was trying to do everything she could to get Father in trouble with his employer to gain an advantage in this matter.

(Doc. #87 at 6-7).

{¶ 8} The trial court subsequently overruled an objection by Amanda directed to

the issue of Joshua's alleged alcohol and drug abuse. In support, it made the following findings:

> \* \* \* Plaintiff's mother testified the Defendant was drunk all the time but then retracted the statement on cross; stating the Defendant only had one or two beers each day during the week. The Court finds drinking is not a reason to stand in the way of designating a party as the residential parent if there is no credible evidence Defendant drinks to excess or that the drinking impacts the minor child.

> The GAL did not believe the stories about drug and alcohol abuse. The Court does not find any credible evidence was presented to prove the Defendant abused alcohol or drugs. The GAL testified the Defendant has not had any legal issues with alcohol or drugs. In her reports, the GAL stated both parties told her the other party is a good parent and neither parent stated the other parent abused the child. The GAL also found that **both** parties participated in questionable lifestyle choices that contributed to the demise of the marriage. The Court finds the Second District has affirmed a trial court's award of custody to parents with a prior history of substance abuse if it is found to be in the best interest of the child to do so.

> Plaintiff alleges the Defendant abused drugs while attending a Halloween party at Masque Night Club. Her boyfriend, James McCormick, testified he observed Defendant's girlfriend talking to a man at the nightclub and heard him ask if she "was rolling." McCormick explained that "rolling" is drug slang for being high on ecstasy. McCormick *heard* the conversation at

a busy two story night club with loud music playing. McCormick acknowledged the drug paraphilia [sic] he saw the Defendant's girlfriend with may have been a cigarette holder and part of the flapper costume she wore to the nightclub. He also stated the girlfriend could have been smoking a cigarette. McCormick admitted he did not see Defendant or his girlfriend take ecstasy. The Defendant denied taking drugs on cross and another witness at the club testified he did not see the Defendant taking drugs.

McCormick acknowledged he discussed the case with the Plaintiff prior to trial and admitted on cross he was at the club specifically to gather evidence against Defendant and his girlfriend or to see if the couple would do anything objectionable that could be reported to the GAL; whether it was drug use or any other type of activity. The Plaintiff also verified she and McCormick went to Masque Night Club to obtain proof the Defendant was abusing drugs. Mr. McCormick testified he observed the Defendant sweating and drinking a liquid. He then agreed on cross examination the Defendant and his girlfriend were dancing and that he (McCormick) also sweats and drinks liquids when he dances. McCormick observed there were no children present at the club. The GAL Supplemental Report states that Plaintiff's motivation for requesting the drug test was her observations of the Defendant and his girlfriend at the Masque Night Club Halloween party. The Court does not find any of the testimony to be "credible or substantial" evidence but rather a fishing expedition.

The Court finds the Defendant regularly undergoes drug testing as

an employment condition and has passed all testing. Defendant was drug tested on November 26, 2014. The test was negative. Defendant also testified he has never failed a drug test. The Court finds McCormick's testimony to be speculative and finds the nightclub incident will not be considered when allocating parental rights and responsibilities because the child was not present and no credible evidence was presented to prove the incident had any impact on [the child]. The Court further finds the Plaintiff failed to produce any credible evidence of substance abuse.

(Doc. #124 at 2-5).

{¶ 9} On appeal, Amanda challenges the trial court's credibility determinations regarding alleged drug and alcohol abuse. She suggests that Joshua did abuse alcohol, that he was smoking marijuana in the nightclub, that Joshua's girlfriend used ecstasy, and that the trial court unfairly characterized the testimony about the nightclub incident as part of a "fishing expedition." Amanda also contends the trial court erred in finding that she went to the nightclub to obtain proof of Joshua's drug use. She claims she actually went to obtain proof that his new girlfriend was using drugs. (Appellant's brief at 15-17).

{¶ 10} We find Amanda's arguments unpersuasive. Regardless of whether her trip to the nightclub was a "fishing expedition" or the specific reason for the trip, the fact remains that the trial court found no credible evidence of alcohol or drug abuse by Joshua. As set forth above, the magistrate and the trial court both addressed the evidence presented on the issue, and the trial court found no excessive drinking or drug use having an adverse impact on the parties' child if Joshua obtained custody. In their role as the triers of fact, the magistrate and the trial court acted within their discretion in making the

credibility determinations that they did. Although Amanda disagrees with the trial court's findings, we see no abuse of discretion.

**{¶ 11}** We also see no abuse of discretion in the trial court's failure to find that Amanda offers the parties' child greater "stability" than Joshua. With regard to this issue, which is the subject of Amanda's third assignment of error, the magistrate concluded that Joshua generally was "more settled and stable" than Amanda, that he was "in the best position to be making the majority of the decisions regarding the child's health and education," and that the child was "well settled" in Joshua's school district. (Doc. #87 at 4-5). In her objections, Amanda asserts that she had more "stability" and that she was better suited to make decisions for the child. (Doc. #107 at 10). The trial court overruled this objection, reasoning:

> * * * The Court finds the Defendant is the more stable parent. The Defendant has remained in the marital residence and has stable employment. The Plaintiff has changed jobs. The Defendant has had one prior marriage and one relationship since the marriage broke up. The Plaintiff has had two relationships since the break up and two previous marriages. Defendant has access to consistent medical care through Wright Patterson Air Force Base and the child is receiving treatment through the base medical facilities. Defendant also has more flexibility with his schedule so the child spends less time in daycare. The Court further finds Plaintiff's concerns about the Defendant's household are speculative. Both parents' strengths and weaknesses were weighed against the factors listed in O.R.C. 3109.04(F) and it is determined that designating the Defendant as

the residential parent is in the best interest of the child.

Plaintiff's argument concerning the school district is not convincing. Both schools are top rated schools and Plaintiff admits she would not be living in [her local school district] if she did not have a relationship with Mr. McCormick. Further Plaintiff failed to provide the Court with an alternative report or expert witness to impeach the GAL reports and recommendations.

(Doc. #124 at 5).

{¶ 12} On appeal, Amanda asserts that Joshua lacks stability because he was controlling of her during the marriage, drank heavily, assaulted her and her other child, and unilaterally enrolled the parties' child in his local school district's schools. Citing post-trial contempt hearing testimony, she also claims he acted irrationally and once took the child on an unscheduled day.

{¶ 13} We find Amanda's arguments to be unpersuasive. The magistrate and the trial court both reviewed testimony about the foregoing issues. The magistrate found Amanda's allegations of domestic violence unconvincing and her evidence about alcohol abuse exaggerated. With regard to the issue of Joshua once taking the child, the magistrate concluded that it involved unwarranted "hysteria" on Amanda's part. Finally, with regard to the schooling issue, the magistrate concluded that Joshua's decision was correct and that the child was doing well in the child's school system. The trial court also concluded that the domestic-violence allegations were unfounded, that the testimony about alcohol abuse lacked credibility, that Amanda's concerns about the school district were not convincing, and that Joshua's act of taking the child on an unscheduled day was a "technical violation" due in part to the child's illness. (Doc. #124 at 2-5, 9).

{¶ 14} Having reviewed the record, we conclude that the magistrate and the trial court had discretion to find that Joshua would provide the parties' child with greater stability than Amanda. Assessing the relative stability of the parties is a matter particularly well suited to resolution by the trier of fact. Both parties have their respective strengths and weaknesses, and the record reflects that both parties have been good parents, a fact recognized by the magistrate. Nevertheless, the magistrate and the trial court examined the evidence and assessed the parties' relative situations and parenting skills and concluded that, between the two of them, Joshua was best suited to provide a stable environment for their child. On the record before us, this conclusion is not an abuse of discretion.

{¶ 15} Finally, Amanda objects broadly to the trial court's designation of Joshua as the residential parent and legal custodian of their child. Under her first assignment of error, she contends the GAL's report exhibited gender bias because it noted that she had been divorced twice and quickly had moved into a residence her new boyfriend owned. She criticizes the GAL for expressing a hypothetical concern that if her relationship ended, she and the child would have to move from that residence. Conversely, Amanda claims the GAL was not bothered by the fact that Joshua was divorced and was seeing a married woman who planned to move in with him.

{¶ 16} We see no improper gender bias in the GAL's report or, more importantly, in the trial court's ruling. As a factual matter, Amanda did have two prior marriages whereas Joshua had one. The significance of the difference may be debatable, but to the extent that it may have had some relevance to the parties' relative stability, we see no gender bias in recognizing that one party had two prior marriages whereas the other party

had one. Nor do we find gender bias in the GAL's concern about Amanda having to move from her boyfriend's house if her relationship with him ended. The fact that Amanda lived in someone else's house relevantly distinguished her situation from Joshua's insofar as he resided in his own house.

{¶ 17} Amanda next argues that a problem with the heating system in her boyfriend's house was promptly corrected and that her other child's therapy visits were temporarily interrupted due to insurance and military base-access issues. Both of these issues were discussed during the final hearing, and the trial court does not appear to have been troubled by them. It did not mention them in its entry overruling Amanda's objections. (Doc. #124). Amanda similarly characterizes as a "non-issue" the fact that she once was late picking up the parties' child from daycare. We agree. Amanda explained the issue during the final hearing, and the trial court did not rely on it. (*Id.*).

{¶ 18} Amanda next discusses the alleged drug and alcohol abuse by Joshua and his new girlfriend at the nightclub and elsewhere. As set forth above, those issues were fully addressed and considered by the magistrate and the trial court.

{¶ 19} Amanda also notes that Joshua's "flexible" work schedule was one factor (among many) upon which the trial court relied to grant him legal custody. She argues, however, that he was unable to leave work to undergo a court-ordered drug test, thereby calling into question whether his schedule truly was flexible. We disagree. Joshua testified that on the occasion in question, he had just missed more than two weeks of work due to surgery. Immediately upon his return, he was ordered to undergo random drug testing at work. For that reason, he could not leave that day to undergo the court-ordered hair-follicle testing. (Tr. Vol. II at 342). The fact that Joshua could not leave work on one

occasion to undergo a drug test does not negate the evidence that his work schedule generally provided more flexibility than Amanda's.

**{¶ 20}** Amanda next argues that she was involved in parenting the parties' child and that the child was bonded to both parents. Amanda additionally notes that both parties had split their parenting time roughly equally during the pendency of the case and that the GAL recommended the standard order of parenting time for Amanda with some additional time. We agree. The record does reflect that both parties were involved with the child and that both had substantial parenting time while the case was pending. We note too that the trial court ultimately did award Amanda parenting time far in excess of what the standard order would have provided. (Doc. #125 at 3). We see no error.

**{¶ 21}** Amanda next notes Joshua's failure to submit to the above-referenced court-ordered hair-follicle test when ordered. The trial court addressed this issue, noting that he had a viable explanation, namely he was undergoing surgery, and that he took the test later. We see no abuse of discretion in the trial court's handling of the issue.

**{¶ 22}** Amanda also complains about Joshua "unilaterally" enrolling their child in full-time kindergarten and once cancelling an appointment without her knowledge. She also complains about him being physically abusive toward her other child. Once again, the magistrate and the trial court heard evidence about each of these issues. The allegations of abuse were found unconvincing. The magistrate found the change in kindergarten appropriate and beneficial to the parties' child, and the trial court characterized Amanda's school district concerns as "unconvincing." Again, we see no error.

**{¶ 23}** Finally, Amanda raises the issue of Joshua taking the parties' child once on

her parenting day. She contends his conduct "calls into question his fitness to function effectively as the child's residential parent." We disagree. This issue was the subject of a June 25, 2015 hearing. The magistrate and the trial court both addressed the issue, with the trial court finding nothing more than a "technical violation" of the parenting order due in part to the child's illness. (Doc. #124 at 9). The trial court noted too that "makeup parenting time was offered and accepted." (*Id.*). We see no abuse of discretion in the trial court's consideration of the issue. Having rejected each of Amanda's arguments, we overrule her first, second, and third assignments of error.

{¶ 24}  In her fourth assignment of error, Amanda contends the trial court abused its discretion in finding her underemployed and in awarding only a 30 percent child-support deviation.

{¶ 25} Amanda's argument concerns a reduction in her average hours of work per week as a dental hygienist. Prior to the reduction, she averaged 32 hours per week. The record reflects that she voluntarily agreed to give up one day of work per week to enable her employer to hire another part-time hygienist. Amanda's supervisor, Stephanie Iiams, testified that effective April 2015 Amanda would be giving up her Tuesday hours and then would be averaging 25 hours per week. (Tr. Vol. I at 59-62). Iiams testified that Amanda's stated reason for agreeing to the reduction was "to spend more time with her children." (*Id.* at 60).

{¶ 26} For purposes of its child-support computation, the trial court calculated Amanda's income based on a 32-hour average work week. In overruling an objection directed to this issue, the trial court found that that her existing 32-hour work schedule often allowed her to leave by 2:00 p.m. and afforded her ample parenting time. The trial

court concluded that Amanda was voluntarily underemployed and refused to recognize the reduction in hours when computing her support obligation. As set forth above, however, the trial court did grant Amanda a 30 percent downward deviation in her support obligation to account for "[a]dditional [parenting] time Mother spends with the child." (Child Support Computation Worksheet, accompanying Doc. #125).

{¶ 27} Despite the fact that her assignment of error mentions the trial court's 30 percent downward deviation, Amanda's argument thereunder fails to address that issue or demonstrate error in the deviation, which worked to her advantage. Her argument focuses solely on the trial court's finding of voluntary underemployment. She reasons:

> * * * Amanda was accommodating her office to enable them to hire another hygienist while freeing up time to spend with [the parties' child], which is in [the child's] best interests, particularly in view of [the child's] educational and behavioral difficulties. Appellee made no showing that Amanda forfeited the hours at issue in order to defeat a child support obligation or to evade her responsibility to support her child. Furthermore, Appellee did not demonstrate that Amanda's decision was not in [the child's] best interests. In view of these circumstances, Amanda's decision to relinquish about seven hours' time a week from her schedule did not amount to voluntary underemployment.
>
> The GAL had looked to the flexibility in the parties' schedules, indicating that Joshua had greater flexibility in being able to leave work. (Tr. 81). Then, when Amanda attempted to gain greater flexibility to afford her more time with [the parties' child], the Court attributed this action to

voluntary un[der]employment rather than seeing it as a move that was made to further the child's best interests.

(Appellant's brief at 21).

{¶ 28} We review a trial court's finding of voluntary underemployment and its imputation of income for an abuse of discretion. *In re S.E.*, 2d Dist. Montgomery No. 25743, 2013-Ohio-5057, ¶ 8. "An abuse of discretion means that the trial court's attitude was unreasonable, arbitrary, or unconscionable." *Steele v. Steele*, 2d Dist. Montgomery No. 25713, 2013-Ohio-3655, ¶ 23.

{¶ 29} We see no abuse of discretion here. Amanda contends Joshua failed to prove that she reduced her hours with the subjective intent to defeat a child-support obligation. But no such showing was required. *Robinson v. Robinson*, 168 Ohio App.3d 476, 2006-Ohio-4282, 860 N.E.2d 1027, ¶ 49 (2d Dist.). With regard to voluntary underemployment and the imputation of income, R.C. 3119.01(C)(11) lists factors for a trial court to consider. They include things such as a parent's education and employment experience, the availability of employment, prevailing wages, a parent's special skills and earning ability, and other things. Although the trial court did not explicitly refer to these factors, Amanda has not referred to them either or raised the trial court's failure to do so as an issue. In any event, under the facts before us, resolution of most of the factors cannot be disputed. Because Amanda simply reduced her hours with her current employer, she obviously possesses the education, skills, and experience to perform her job. The prevailing wage also is not in dispute. Nor is the fact that the foregone hours were available to her. The primary issues on appeal are whether Amanda had an objectively-reasonable basis for reducing her work hours and what impact, if any, her

decision had on the parties' child.

{¶ 30} On appeal, Amanda cites her desire to spend more time with the parties' child, and the resulting benefit to the child, as the basis for her voluntary reduction in hours. She asserts that spending more time with the child is particularly beneficial given the child's "educational and behavioral difficulties." Finally, she asserts that her reduction in hours was an attempt to gain "flexibility" in her work similar to the flexibility that Joshua's military job affords him. The trial court reasonably rejected these arguments.

{¶ 31} A parent's desire to spend more time with his or her child does not necessarily justify voluntary underemployment. If the rule were otherwise, a parent always could avoid the imputation of income by citing such a desire. In her supplemental objections below, Amanda argued that the present case is analogous to *Aldo v. Angle*, 2d Dist. Clark No. 09-CA-103, 2010-Ohio-2008. In that case, the father voluntarily left a private-sector aviation job to take a lower-paying position with the Federal Aviation Administration. The trial court rejected an argument that the father was voluntarily underemployed and declined to impute income. On appeal, this court affirmed. In so doing, this court recognized that a drop in income due to a voluntary choice does not necessarily establish voluntary underemployment. *Id.* at ¶ 35. To avoid imputing income in such a case, there must be an objectively reasonable basis for diminishing employment. *Id.* In *Aldo*, this court found an objectively reasonable basis primarily because the father reasonably believed the FAA position provided greater job security, which improved his long-term ability to provide for his child. *Id.* at ¶ 38-39. Secondarily, this court noted the father's "qualify of life" concerns, which included his increased ability to visit his child after taking the FAA job. *Id.* at ¶ 40. The private-sector job had required

the father to work long hours, odd hours, and overtime, resulting in some cancelled visits with his child or his forced use of vacation leave. In contrast, the FAA job provided regular hours, including weekends and holidays off. Because the FAA job lacked the specific "impediments to visitation" that the private-sector job involved, the trial court reasonably concluded that the resulting increased visitation was in the child's best interest.

{¶ 32} Contrary to Amanda's argument, we see little similarity between the present case and *Aldo*. The overriding job-security concerns at issue in *Aldo* do not exist here. Moreover, we see no evidence that Amanda's prior work schedule impeded her visitation in any special way. Obviously, any hours a parent spends working at any job cannot be spent visiting a child. But without more, that fact alone cannot make it objectively reasonable to stop working or to work less. Otherwise, Amanda could use the same argument to stop working on other days of the week too, or to stop working entirely. *Aldo* involved a situation where the father worked long, irregular hours. He replaced that job with full-time employment that had regular hours, thereby improving his ability to visit his child. Here Amanda simply stopped working one day a week. Although the extra day off might improve her ability to visit the child (at least during weeks when the child stays with her and assuming the child is not in school), we see nothing specific about Amanda's prior part-time work week that impeded her visitation.

{¶ 33} The trial court also reasonably could have rejected Amanda's suggestion that certain "educational and behavioral difficulties" experienced by the parties' child justified her reduction in hours. The only potential "behavioral difficulty" reflected in the record involves the child taking certain medication. At the time of the final hearing, the child's behavior and school work had improved and the child had started attending full-

time kindergarten every day. (Tr. Vol. I at 25-33). The trial court reasonably could have concluded that Amanda not working on Tuesdays would have little or no impact on the child's education and behavior.

{¶ 34} Finally, Amanda's suggestion that she quit working on Tuesdays so she could match Joshua's job flexibility is unpersuasive. The record reflects that Joshua's military job provides him with scheduling flexibility for purposes of appointments and taking time off of work. (Tr. Vol. II at 318-319). Although Amanda's work schedule is more structured, the trial court was not required to allow her to attain greater "flexibility" by simply stopping working on Tuesdays. By definition, not working always provides greater flexibility than working, but that argument could be used to justify not working on additional days, or any days at all.

{¶ 35} For the foregoing reasons, we see no abuse of discretion in the trial court's decision to find Amanda voluntarily underemployed and to calculate her income based on a 32-hour average work week. The fourth assignment of error is overruled.

{¶ 36} In her fifth assignment of error, Amanda challenges as an abuse of discretion the trial court's decision to award Joshua one-half of the equity in a Texas residence owned by her. Amanda notes that she purchased the house prior to the parties' marriage and that she alone was responsible for the mortgage. Amanda further asserts that she made substantial post-marriage improvements to the house using her own separate funds. She also maintains that, after the parties left Texas, rental income from the house covered the mortgage and the cost of maintenance. Finally, she asserts that both parties benefitted from a depreciation tax deduction for the Texas home during the marriage.

{¶ 37} Upon review, we see no abuse of discretion in the trial court's decision. The record reflects that Amanda purchased the home in 2004 prior to the parties' marriage. She borrowed $71,540, which was approximately the purchase price, to buy the house. (Tr. Vol. I at 187). At that time, the house appraised for $71,000, meaning that Amanda had no equity. (*Id.* at 242). Joshua lived in the home with Amanda rent-free for approximately five months before they married. (*Id.* at 188). When the parties married in July 2005, the mortgage balance was still $70,342. (*Id.* at 243).

{¶ 38} During the final hearing, Amanda testified that she made about $30,000 in improvements to the home prior to the marriage using her own money. (*Id.* at 189). Specifically, she mentioned installing "new flooring, [a] new roof, painting, decking, a second bathroom, air conditioning, [and] HVAC." (*Id.*). She later mentioned "redoing the foundation" and correcting a "dip" in the roof. (*Id.* at 243). On cross examination, Amanda conceded that the parties maintained at least one joint account out of which they paid expenses. She could not recall whether they maintained the joint account before or after the marriage. (*Id.* at 247-248). She also reviewed and acknowledged a post-marriage bill on Joshua's Home Depot account for the $7,000 HVAC system. (*Id.* at 248-249). Amanda insisted, however, that she paid the bill herself even if she paid it after the marriage. (*Id.* at 249, 264). She also testified that Joshua performed a lot of the remodeling work on the house before the parties married. (*Id.* at 250).

{¶ 39} For his part, Joshua testified that he and Amanda opened a joint bank account shortly after he moved into the Texas house with her. (Tr. Vol. II at 294). Joshua explained that he and Amanda, who also was in the military at the time, both transferred their military housing and food allowances into the joint account and paid all of their

housing (including the mortgage), food, and utility costs out of the joint account. (*Id.* at 294, 362). Joshua testified that the Texas house was a 1948 farmhouse, which was "dilapidated" and "extremely run down" when he moved into it. (*Id.* at 297). Joshua stated that he made numerous improvements to the house, some of which he started soon after moving in. He explained that most of the improvements were made after the marriage when he and Amanda returned from a deployment together. (*Id.* at 298-299). Among other things, Joshua recalled that he and Amanda had a new HVAC system installed, added ductwork, added a second bathroom, installed French doors, painted the interior and exterior, installed laminate flooring, added a storm door, replaced some windows, replaced a dishwasher, and had termite damage repaired. (*Id.* at 298-299). Joshua identified the HVAC charge as being placed on his Home Depot account after the parties' marriage. (*Id.* at 300). He also testified that the payments were made using both parties' deployment money that had been placed in a joint account. (*Id.* at 301, 386). He identified a post-marriage bill in his name for the replacement windows and pictures of siding repairs and a deck installation that he performed after the marriage. (*Id.* at 301-302). Joshua additionally testified about a joint $5,000 loan he and Amanda had taken out to have the house levelled. (*Id.* at 304). According to Joshua, after the parties left Texas in May 2007, he began overseeing the rental of the house, dealing with the finances, overseeing repairs, and dealing with property managers. (*Id.* at 306-308, 364).

{¶ 40} Based on the evidence presented, the magistrate made the following findings with regard to the Texas home:

> * * * Shortly after the purchase of the property in 2004, both parties
> began work to improve the property. When the parties married in July 2005,

Mother owed a principal balance on the mortgage of $70,342 and the property was worth substantially the same as the time of the purchase, creating only minimal equity in the property at the time of marriage ($658). By the time of the parties' separation, the property had a value of $126,760. The Magistrate finds that Mother failed to prove by a preponderance of the evidence that only her separate funds were used to pay for the improvements to the property or that the increase in value of the property was a result of passive appreciation. The Magistrate finds quite the contrary. Father contributed to the expenses of the improvements to the home through his income during the marriage as well as significant physical labor. Father was the primary person completing the updates including a complete remodel of one of the bathrooms, installing new flooring, painting, installing French doors and storm door. Marital funds were used to pay for the improvements and both parties were liable on a home improvement loan used to update the property. Both parties contributed housing allowance monies to pay for many of the improvements and repairs. It was marital effort and funds that transformed the property into an income generating asset and therefore the appreciation in the residence is active and marital in nature.

After the parties moved to Arizona, the Texas property was rented and the rent was used to pay the mortgage. The parties employed the use of a rental agency in Texas to collect rent, maintain the property and pay the mortgage. The rental income was able to be at a level sufficient to pay

the mortgage and expenses of the property primarily due to the improvements made to the home. During the course of the marriage until the parties' separation, the principal balance of the mortgage was reduced by $14,808. This reduction is a result of both parties' incomes during the marriage, the sweat equity provided by both parties during the marriage and the rent collected during the term of the marriage. Wife has remained responsible for the payment of the mortgage since the separation of the parties, but has been able to do so because the property is self-sufficient as long as it is rented.

The Magistrate concludes that the increase in the value of the residence is the direct result of marital funds paying the mortgage and the work of both parties to improve the residence and not due to passive appreciation. Therefore, even though the property was owned by Mother prior to the marriage, the increase in the value of the home is a marital asset. The Magistrate finds that the net marital equity of the property is $71,534 ($126,760 value at separation minus $55,534 principal balance on the mortgage at separation). Therefore, each party is entitled to one half of the marital equity in the amount of $35,767.

Mother argues that since the parties took deduction of the Texas residence on their taxes, that Husband should be responsible for some of the depreciation should the house be sold. The Magistrate takes judicial notice of the US tax code regarding the repayment of depreciation. The total depreciation taken by the parties was $7,092. Should Mother sell the

property, she will have to claim the depreciation amount on her taxes as income. Both parties received a benefit of the depreciation. Therefore, the Court finds that the depreciation expense claimed on the joint taxes is the equal responsibility of the parties. The depreciation expenses reduce the marital equity in the property from $71,534 to $64,442.

(Doc. #87 at 16-17).

**{¶ 41}** In overruling Amanda's objection to the magistrate awarding Joshua one-half of the marital equity in the Texas home, the trial court reasoned:

* * * The Texas property was purchased by Plaintiff on April 28, 2004. The parties were married on July 5, 2005. Plaintiff obtained a VA loan in the amount of $71,540. Plaintiff testified she borrowed 100% of the asking price plus additional sums. Defendant submitted an appraisal that placed the current value of the property at $126,760. The Court finds the house appreciated 44% since its purchase date and the appreciation is active rather than passive. Defendant presented credible evidence he and Plaintiff made numerous improvements to the house during the marriage and the money for the improvements came out of marital funds deposited into a joint account during the marriage.

The Court finds in order for the Plaintiff to prevail on an award of separate property, she is required to show the real property's increase in value was passive and any monies used to pay down the mortgage or to make improvements are traceable as her separate property.

Plaintiff testified she made monthly payments out of her separate

account on a HVAC system purchased for the Texas property on October 5, 2005 or after the date of marriage. The parties were married on July 5, 2005. The HVAC system was estimated at $6,993.00. Defendant testified that he paid for the HVAC equipment by taking out a credit card from Home Depot. The parties made the credit card payments out of a joint account that both parties deposited their paychecks, BAS and BAQ into. Plaintiff also testified windows were purchased for the Texas property at a cost of $966.28. The invoice is dated May 10, 2006. Plaintiff stated the windows were paid out of a joint account. Plaintiff's Exhibit 22 is an invoice for Double-L Roofing Co. in the amount of $1,200.00.

The Court finds this is the same joint account Defendant identified. Plaintiff failed to present evidence that her separate money paid for improvements and the mortgage. Plaintiff testified on direct the Defendant had all the banking statements. Defendant testified on cross he did not have the bank statements. The Court finds the Plaintiff could have obtained her banking records from the bank without any help from the Defendant.

It is undisputed that the house was rented when the parties moved to Arizona. It is also undisputed that the home generated enough income to pay the mortgage and to pay for any maintenance the property might require. It is clear that the improvements made during the marriage made the home attractive to potential renters. The fact that the parties mingled their money would not be a factor if the Plaintiff had shown the money that paid for the improvements was her money alone. Also the Defendant proved

he provided the labor for many of the property improvements. An increase in the value of separate property due to either spouse's efforts is marital property.

(Footnotes omitted) (Doc. #124 at 6-8).

{¶ 42} Ultimately, the trial court's final judgment and divorce decree awarded Joshua one-half of the $64,442.[1] (Doc. #125 at 7). We see no abuse of discretion. The record fully supports the trial court's finding that the appreciation in the Texas home was active rather than passive, that it was attributable to the efforts of Amanda and Joshua, and that marital funds were used to pay the mortgage and to make the numerous improvements. Under these circumstances, the trial court did not err in ordering the parties to split equally the equity accrued during the marriage (minus the above-referenced adjustment to account for the depreciation deduction from which both parties benefitted during the marriage). The fifth assignment of error is overruled.

{¶ 43} The judgment of the Greene County Common Pleas Court, Domestic Relations Division, is affirmed.

. . . . . . . . . . . . .

FROELICH, J. and TUCKER, J., concur.

Copies mailed to:

Cheryl R. Washington
Craig M. Sams
Hon. Steven L. Hurley

---

[1] We note that the trial court then reduced this amount to account for Amanda's share of the equity in the marital residence in Ohio.